**No. 25-10887**

# In the United States Court of Appeals for the Fifth Circuit

NATHAN CRAWFORD,

Plaintiff–Appellant,

v.

WEST TEXAS A&M UNIVERSITY,

Defendant–Appellee.

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## BRIEF FOR APPELLEE

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

NATHANIEL A. PLEMONS
Assistant Solicitor General

MOHMED I. PATEL
Assistant Attorney General
Mohmed.Patel@oag.texas.gov

*Counsel for Appellee*

## Certificate of Interested Persons

No. 25-10887

---

Nathan Crawford,

Plaintiff–Appellant,

v.

West Texas A&M University,

Defendant–Appellee.

---

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Mohmed I. Patel
Mohmed I. Patel
*Counsel for Appellee*

## Statement Regarding Oral Argument

Appellee submits that oral argument will be useful to this Court in its decision-making process and thus requests that oral argument be scheduled. Although this case is straightforward, oral argument would erase any doubt that this case presents no genuine issue of material fact.

# Table of Contents

Page

Certificate of Interested Persons .......... i
Statement Regarding Oral Argument .......... ii
Table of Authorities .......... iv
Statement of Jurisdiction .......... 1
Issue Presented .......... 1
Introduction .......... 2
Statement of the Case .......... 3
I. Factual Background .......... 3
II. Procedural Background .......... 11
Summary of the Argument .......... 12
Standard of Review .......... 15
Argument .......... 15
I. Crawford Lacks Direct Evidence of Retaliation. .......... 15
II. Crawford Lacks Circumstantial Evidence of Retaliation and Thus Cannot Satisfy the *McDonnell Douglas* Framework. .......... 17
A. Crawford cannot establish a prima facie retaliation case. .......... 18
1. Crawford cannot establish an adverse employment action. .......... 18
2. Crawford cannot establish causation. .......... 21
B. WTAMU has a legitimate, non-retaliatory reason for each allegedly adverse employment action. .......... 25
C. Crawford cannot establish pretext. .......... 28
Conclusion and Prayer .......... 32
Certificate of Compliance .......... 33

# Table of Authorities

Page(s)

**Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 15

*Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000) .......... 19, 20, 21

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408 (5th Cir. 2007) .......... 15, 17, 18

*Caboni v. Gen. Motors Corp.*, 278 F.3d 448 (5th Cir. 2002) .......... 15

*Cabral v. Brennan*, 853 F.3d 763 (5th Cir. 2017) .......... 18

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) .......... 24

*Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108 (5th Cir. 2005) .......... 21

*Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409 (5th Cir. 2003) .......... 16, 17

*Fine v. GAF Chem. Corp.*, 995 F.2d 576 (5th Cir. 1993) .......... 20

*Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236 (5th Cir. 2019) .......... 24

*Goudeau v. Nat'l Oilvell Varco, LP*, 793 F.3d 470 (5th Cir. 2015) .......... 24

*Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) .......... 18, 21

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir. 1991) .......... 25

*January v. City of Huntsville*, 74 F.4th 646 (5th Cir. 2023) .......... 24

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009) .......... 23

*Magiera v. City of Dallas*, 389 F. App'x 433 (5th Cir. 2010) .......... 20

*McCoy v. City of Shreveport*,
492 F.3d 551 (5th Cir. 2007) .......... 18, 26, 29
*Medina v. Ramsey Steel Co., Inc.*,
238 F.3d 674 (5th Cir. 2001) .......... 22
*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) .......... 18, 21
*Nall v. BNSF Ry. Co.*,
917 F.3d 335 (5th Cir. 2019) .......... 22
*Peltier v. United States*,
388 F.3d 984 (6th Cir. 2004) .......... 19
*Pierce v. Tex. Dep't of Crim. Just., Institutional Div.*,
37 F.3d 1146 (5th Cir. 1994) .......... 20
*Russell v. McKinney Hosp. Venture*,
235 F.3d 219 (5th Cir. 2000) .......... 29, 31
*Sherrod v. Am. Airlines, Inc.*,
132 F.3d 1112 (5th Cir. 1998) .......... 23
*Vaughn v. Edel*,
918 F.2d 517 (5th Cir. 1990) .......... 16

**Statutes and Rules:**

28 U.S.C.
§ 1291 .......... 1
§ 1331 .......... 1
42 U.S.C.
§ 2000e-2(a)(1) .......... 18
§ 2000e-3(a) .......... 1
Tex. Educ. Code § 51.252 .......... 9, 26
Fed. R. Civ. P. 56 .......... 15

**Other Authorities:**

Regulation 31.03.03, *Leaves of Absence with Pay* (rev. July 10, 2023),
https://policies.tamus.edu/31-03-03.pdf .......... 22

## Statement of Jurisdiction

The district court had federal question jurisdiction over Crawford's Title VII claims. 28 U.S.C. § 1331; 42 U.S.C. § 2000e-3(a). The district court granted summary judgment against Crawford and entered its final judgment dismissing his claim on July 1, 2025. ROA.1469. Crawford timely filed his notice of appeal on July 31, 2025. ROA.1487. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issue Presented

Whether the district court correctly held that Crawford failed to create a genuine issue of material fact on his Title VII retaliation claim, which is not based on unlawful retaliation but rather Crawford's decision to secretly record his police chief's phone call with his assistant chief and then lie about it.

# Introduction

This appeal presents a run-of-the-mill employment-retaliation suit. But the employee's misconduct here was anything but. Nathan Crawford, a former detective at West Texas A&M University (WTAMU), secretly recorded a private phone call taking place in his superior's office in department headquarters. He did so by creeping near the office, placing his cellphone near the door, and setting it to audio record the private call for nearly 105 seconds. Crawford then lied about how the recording was obtained, claiming that he made the recording from his office. But video footage from inside the police department caught Crawford's every move. As a result, Crawford was suspended with pay and an internal investigation was launched into whether Crawford violated university policy or state law.

Now, despite deliberately engaging in workplace misconduct, Crawford attempts to shift blame. Crawford insists that the investigation and suspension levied against him actually trace back to his participation in an unrelated Title IX investigation that occurred more than a year prior. Crawford is wrong. He was suspended with pay because university policy required as much. And he was investigated because he violated university policy and state law—as an independent, third-party investigation later concluded. There is nothing retaliatory about suspending and investigating a police officer that secretly records his superior's private phone call and then lies about how that recording was obtained.

Applying well-settled Title VII law, the district court did not err in holding as much. Thus, it did not err in granting WTAMU's motion for summary judgment, and this Court should affirm.

# Statement of the Case

## I. Factual Background

**A.** Before working at WTAMU, Nathan Crawford was a deputy for the Randall County Sheriff's Office from 2010 to 2015. ROA.216. Crawford's disciplinary record from that time was, at best, checkered. Over his five-year tenure, Crawford received several disciplinary warnings. And within just his first year, Crawford received warnings for "sexual[ly] harass[ing]" a "female coworker" and using obscenity while dispatching a police radio call—a "complete disregard of professionalism and FCC rules." ROA.252. The next year, Crawford was disciplined for falling "asleep while providing security" for a federal inmate. ROA.251. The year after that saw Crawford being disciplined again, this time for failing to enforce a different jailhouse safety policy. ROA.250. Soon after, Crawford received yet another "writ[e]-up for an unwarranted Use of Force" that "could have been avoided if other steps had been taken." ROA.249.

The last straw came in January 2015, when Crawford "failed to make cell checks" of jail inmates, ROA.253, which contravened department policy and, by then, "seem[ed] to be a re-occurring pattern." ROA.254. Crawford "listed in his paperwork that he had made these checks," ROA.253, but unbeknownst to him, video footage showed otherwise, ROA.254. "[I]f an Inmate had attempted suicide or an escape," Crawford's error would have left that breach "un-detected for several hours." ROA.254. So, Crawford was "written up for failure to do his job, failing to follow policy and for falsifying a County Document." ROA.254. Crawford then resigned—after being suspended with pay. ROA.220, 253.

WTAMU's campus police department hired Crawford as a patrol officer soon after his resignation. ROA.216. He was hired by Chief Shawn Burns, who has worked at WTAMU since 1995 and served as the department's police chief since 2003. ROA.239. After about three years, Crawford was transferred to the department's Criminal Investigation Division, where he worked as a detective until his resignation. ROA.239.

But Crawford's less-than-stellar behavior did not stop after joining WTAMU's campus police department. Since starting at WTAMU, Crawford has "received more complaints from the public than any other WTAMU officer." ROA.239. Two stand out.

The first complaint "was related to an inappropriate social media post . . . that was reported to [the department's leadership] by an Assistant U.S. Attorney." ROA.239. Crawford "had posted the comment '#trash' on an individual's mugshot post on a Facebook page." ROA.239. Crawford received a written reprimand as a result of that complaint. ROA.239.

The second complaint was "made by the mother of a student," who claimed Crawford "was rude and unprofessional" during a phone conversation. ROA.239. Crawford had intervened in "a domestic situation," reporting a "vehicle that was in [their] driveway" as stolen and had it impounded somewhere unreachable. ROA.239. Chief Burns was forced "to personally pay for the tow fee and storage fees in order to get the vehicle released," ROA.239, and Crawford's conduct "resulted in a monetary loss to the department as well as damag[ed]" the department's and WTAMU's public reputation. ROA.240. "Crawford received a written reprimand

as a result for that complaint." ROA.240. As Chief Burns and WTAMU later learned, that was just the beginning of Crawford's misbehavior.

**B.** In August 2021, a female WTAMU patrol officer, Allison Munsell, complained to Chief Burns "about her patrol sergeant, Aaron Price, retaliating against her and threatening write-ups." ROA.240. "Although Munsell did not initially complain of sex discrimination, but rather about retaliation," Chief Burns "personally referred the matter to" WTAMU's Title IX office. ROA.240.

As part of this investigation, Crawford was interviewed by a Title IX investigator, where he revealed that Munsell "told him a couple of months ago that she was experiencing 'sexual harassment, gender-based issues and differential treatment.'" ROA.240. Crawford also mentioned that "other female officers in the department . . . had similar issues." ROA.264. But Crawford never previously reported or disclosed that information to WTAMU's Title IX office, and certainly not in the timely manner required by university policy. ROA.267.

Per university policy, if Crawford had knowledge about ongoing sexual harassment, Crawford was required to timely report it. *See* ROA.263 (citing TAMU System Regulation 08.01.01 and WTAMU University Rule 08.01.01). Thus, after Chief Burns reported his "good faith belief that Crawford had not only violated" university policy "for failing to report sex-based discrimination, but that Crawford also had violated state law," ROA.262, the University's System Ethics & Compliance Office (SECO) began investigating Crawford. Crawford was questioned many times because his story kept changing. *Compare* ROA.266 (claiming Munsell alleged sexual

harassment), *with* ROA.265 (claiming "gender-related issues were not expressed by Munsell" and "sexual harassment never came into the picture").

SECO's investigative report found "sufficient evidence to substantiate the allegation that Crawford failed to report," specifically, that "Crawford had knowledge that Munsell was alleging sex-based discrimination and he did not contact Title IX." ROA.267, 269. Various university policies require that "[i]f an employee reasonably believes that an incident constitutes sexual harassment" and "the incident is alleged to have been committed by or against . . . an employee of the institution . . . , the employee *must* promptly report the incident to the member's Title IX" office. ROA.272 (emphasis added). But Crawford never reported the incident. Thus, SECO's final decision concluded that Crawford was "'[r]esponsible' for violating" the University's sexual-harassment reporting policy. ROA.274. Crawford's punishment was to write an essay on the University's reporting requirement. ROA.274-75.

**C.** Chief Burns, concerned that Crawford might have violated state law and university policy, called his assistant chief, Robert Byrd, to discuss Crawford's investigation. Assistant Chief Byrd took the phone call "on the main campus in his office." ROA.241. The phone call was private: Crawford was certainly "not a party to th[e] conversation between Byrd and Burns." ROA.186. "So [that] he could continue working, Byrd placed the call on speakerphone," discussing, among other things, Crawford's "failure to report" sexual harassment during the August 2021 investigation. ROA.241; *see supra* I.B.

The following day, Chief Burns was informed that Crawford sent an email to SECO with a recording of the phone conversation that took place between Assistant Chief Byrd and Chief Burns. ROA.279. The recording Crawford submitted was "approximately one minute and 44 seconds," and in his email, "Crawford state[d], 'This is from my desk in my office. It's that loud.'" ROA.281. But Crawford's office was over 25 feet from Assistant Chief Byrd's, with doors and walls in between:



ROA.281.

Surveillance footage showed that Crawford, as he did many times before, *see supra* I.A, lied about his whereabouts and deeds. The footage showed Crawford "first appear[ing] in the video frame" a minute into the phone call. ROA.280. For the next few minutes, Crawford walked in and out of his office, standing at his doorway at times, ROA.280-81, until Crawford finally "walk[ed] over to the suite/hallway

door" with "his phone . . . in his hand" "appear[ing] to be audio recording," ROA.281. Then, "Crawford set[] his phone down near the suite/hallway door" and "return[ed] to his office." ROA.281. After 105 seconds, "Crawford retrieve[d] his phone" and "then walk[ed] back in his office." ROA.281. The following image shows where Crawford was standing when recording the private conversation:




ROA.282.

A few days after the incident, Assistant Chief Byrd filed a complaint against Crawford for recording his private conversation with Chief Burns. ROA.277. "Texas is a One-Party State in relation to recording a phone conversation," and, accordingly, Assistant Chief Byrd complained that—because "Crawford was not a party to that phone call," "was not given permission to record" it, and "did not have a warrant or legitimate law enforcement purpose to record"—Crawford acted in "blatant

disregard of Texas (and likely Federal) law." ROA.277; *see also* Tex. Educ. Code § 51.252. Assistant Chief Byrd was "not concerned about what was said [during the] conversation;" what concerned him instead was seeing a department officer "stoop to such low, unethical, and very likely illegal means to record a conversation that he thinks would bolster some issue." ROA.277.

Chief Burns then initiated a confidential internal investigation into Crawford's conduct. ROA.276. First, an administrative investigation was launched "to determine whether any policy or procedures were violated"—that investigation was assigned to Assistant Chief Kyle Hawbaker. ROA.276. A criminal investigation followed "to determine whether criminal laws" were violated—that investigation was assigned to the Texas Rangers. ROA.276. Then, pursuant to university policy, Chief Burns "suspend[ed] [Crawford] with pay while this investigation [was] conducted" and required Crawford to surrender his credentials and weapons. ROA.276.

To ensure a neutral, unbiased investigation, Chief Burns voluntarily "recuse[d] [him]self from" the investigation into Crawford, ROA.278, and "requested that the Council of Texas A&M University System Law Enforcement Administrators ('Council') appoint a panel to hear [Assistant Chief Hawbaker's] investigative findings and render an impartial personnel decision," ROA.241. "The Council appointed Chief Bryan Vaughn of Texas A&M Commerce . . . and Chief Matt Welch of Tarleton State University . . . to conduct an independent investigation." ROA.241. Chief Burns had zero influence on their investigation. *See* ROA.241-42. And neither Chiefs Vaughn nor Welch had any "knowledge that Crawford had participat[ed] in a Title IX investigation." ROA.244, 246.

The Council-appointed panel concluded that Crawford violated several WTAMU policies. ROA.291. It first "reviewed the video . . . footage, which showed Crawford" standing near Assistant Chief Byrd's office, "first holding out his phone, then placing [it] down and leaving it unattended, apparently to surreptitiously record audio." ROA.246. The panel then "found that Crawford was dishonest in his" email: "[t]he area where Crawford held the phone and placed [it] was not his office, but rather a reception area." ROA.246. It reasoned that Crawford's conduct was "intentional, and he probably d[id] not know of the existence of the video recording." ROA.290. The panel thus recommended that "Crawford face termination from WTAMU and a dishonorable discharge in his F-5 form to the Texas Commission on Law Enforcement." ROA.246. Chief Burns "was not involved in this process." ROA.242.

**D**. Seeing that "the writing was on the wall," Crawford resigned before WTAMU took any action. ROA.197, 242. Crawford's last day at the department was conveniently the day before he got his Master's degree at WTAMU, *see* ROA.181, and Crawford had already secured a higher-paying job before submitting his resignation letter, ROA.214. Within seven days of Crawford's resignation, Chief Burns, pursuant to the panel's recommendation, issued a dishonorable discharge against Crawford's peace-officer license. ROA.728.

Just before Crawford resigned, he filed—in response to the investigation launched against him for his misconduct during the August 2021 investigation—his own complaint against Chief Burns, "alleging that [Chief] Burns retaliated against" him for "participating in a discrimination investigation." ROA.297. But the outcome

of that administrative case cleared Chief Burns of any alleged wrongdoing, finding Crawford's "allegations of unethical and improper conduct . . . not substantiated." ROA.294. "As Police Chief, Burns had a duty to respond to misconduct alleged against his officers," ROA.294, and "[i]t is clear that [Chief] Burns would move to terminate Crawford if it was found that Crawford violated state law. Th[at] . . . is not retaliation . . . ; it is reasonable to assume that [Chief] Burns would consider this action with anyone under his supervision that violated state law," ROA.297.

## II. Procedural Background

Crawford filed a discrimination charge with the EEOC alleging three adverse employment actions: (1) then-Lieutenant Hawbaker said Crawford had no shot at making sergeant; (2) WTAMU initiated a disciplinary proceeding against Crawford after he failed to report sexual harassment during the August 2021 investigation; and (3) Crawford was investigated and then suspended with pay for making a recording of a private phone conversation. ROA.10, 938. Crawford also claimed that he "had superb performance evaluations and ha[d] never been suspended or placed on leave before." ROA.940. The EEOC later issued Crawford a right-to-sue letter. ROA.11.

Crawford sued WTAMU[1] in September 2023, alleging retaliation and constructive discharge under Title VII of the Civil Rights Act of 1964. ROA.11. WTAMU moved for summary judgment. ROA.150. Relevant here, WTAMU argued that (1) some of Crawford's claims were barred because they were not administratively exhausted through the EEOC process; (2) Crawford, who relied on purely

[1] Crawford also sued the Texas A&M University System, but it was dismissed from the case. ROA.68-69.

circumstantial evidence, could not prove a prima facie case under *McDonnell Douglas*; and (3) Crawford could not prove pretext given WTAMU's legitimate, non-retaliatory reason for the allegedly adverse employment actions. ROA.165-72. Crawford responded that a few of Chief Burns' remarks constituted direct evidence of retaliation and thus *McDonnell Douglas* did not apply, ROA.324-26, but if it did, WTAMU's legitimate, non-retaliatory reason was mere pretext, ROA.326-32.

The district court granted WTAMU's motion for summary judgment. ROA.1469. After dismissing several of Crawford's untimely claims, the district court held that "[n]o genuine issue of material fact exists regarding Crawford's retaliation claim." ROA.1461. It held that no direct evidence supported Crawford's claim because the "three pieces of 'direct evidence'" that he relied on were merely circumstantial. ROA.1462. It therefore applied *McDonnell Douglas*'s framework and concluded that, even though Crawford engaged in Title VII protected activity, WTAMU did not take a materially adverse employment action against him. ROA.1464-66. Even if WTAMU did, the district court held that Crawford nevertheless failed to show a causal link between the protected activity and the adverse employment action. *See* ROA.1466-68.

Crawford timely appealed to this Court. ROA.1487-88.

## Summary of the Argument

Where direct evidence is lacking, this Court evaluates Title VII claims under the *McDonnell Douglas* burden-shifting framework. Crawford lacks direct evidence here, so *McDonnell Douglas* applies. Crawford's claim fails at each step.

**I.** Crawford has no direct evidence here. He nonetheless argues that various "stray remarks" made by Chief Burns constitute direct evidence. That is wrong, as none of those remarks relate to Crawford or his protected activity. Nor do they prove retaliation without requiring an inference or presumption—a hallmark signal that the evidence in question is circumstantial.

**II.** Accordingly, the *McDonnell Douglas* framework applies, under which Crawford's claim fails. The district court correctly rendered at step one—Crawford lacks a prima facie case. This Court should too. But even if this Court proceeds past step one, WTAMU has a legitimate, non-retaliatory reason for each alleged adverse act, and Crawford cannot prove pretext.

**A.** To establish a prima facie case, Crawford must show that: (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. He cannot establish parts two and three.

Crawford alleges three adverse employment actions: the suspension with pay; the investigation launched after Crawford recorded a private conversation; and the issuance of a dishonorable discharge against Crawford's peace-officer license. The latter was improperly pled and therefore forfeited. And none are "materially adverse," as required under this Circuit's precedent.

That, and Crawford cannot show a causal link between his protected activity and each allegedly adverse employment act. For starters, Crawford was not suspended for participating in the August 2021 investigation; instead, the record shows he was suspended because university policy required as much given his misconduct. Nor

was Crawford investigated because he participated in the August 2021 investigation; again, the evidence shows he was investigated after secretly recording his superiors' private conversation and then lying about it. More importantly, Crawford's protected activity played no role in the investigation into his misconduct because the Council-appointed panel investigating Crawford did not know he participated in the August 2021 investigation. Lastly, Crawford was not issued a dishonorable discharge based on his involvement in the August 2021 investigation; instead, the discharge was issued only after the Council-appointed panel recommended as such. Nothing in the record shows the requisite causal link here, so Crawford's claim was properly rejected at step one.

**B.** Even if Crawford established a prima facie case, WTAMU can carry its burden to show a legitimate, non-retaliatory reason for each allegedly adverse act. Crawford's misconduct speaks for itself. He secretly recorded a private conversation between his superiors within department headquarters and then lied about it. That is sufficient to establish that WTAMU had a legitimate, non-retaliatory reason for each alleged adverse employment action.

**C**. Once the burden shifts back, Crawford cannot show pretext. WTAMU's reason for its allegedly adverse employment acts against Crawford has remained steadfast: Crawford secretly recorded his Police Chief's private conversation and then lied about it. WTAMU would react no differently had any other employee behaved as Crawford did. It is entirely legitimate to suspend and investigate a police officer who secretly records his superiors and lies about doing so.

## STANDARD OF REVIEW

This Court reviews a "district court's grant of summary judgment *de novo*." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the "court shall grant summary judgment." Fed. R. Civ. P. 56(a). The movant satisfies this burden by showing that the evidence in the record "do[es] not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

On the other hand, "the nonmovant may not rely on mere allegations in the pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts" from the record that establish a genuine issue on a material fact. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

## ARGUMENT

Title VII retaliation claims "can be proven through direct or circumstantial evidence." *Burrell*, 482 F.3d at 411. But as is true in most Title VII cases, Crawford lacks direct evidence, so he must navigate *McDonnell Douglas*'s well-known burden-shifting framework. Crawford fails at each step, so this Court should affirm.

### I. Crawford Lacks Direct Evidence of Retaliation.

Typically, a Title VII retaliation claim proceeds under the well-known *McDonnell Douglas* burden-shifting framework because "direct evidence of an employer's

allegedly retaliatory intent is rarely available." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). After all, "in the context of a retaliation claim, the employer refrains from expressly stating that an impermissible criterion influenced his decision to expose the plaintiff to an adverse employment action," so "plaintiffs alleging retaliation most often must travel the less advantageous [*McDonnell Douglas*] path." *Id.* Crawford must travel down this path because he lacks direct evidence.

"This Court has defined direct evidence as evidence which, if believed, proves the fact in question without inference or presumption." *Id.* (citation modified). Examples of direct evidence include "statement[s] or written document[s] showing discriminatory motive on [their] face." *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990). But the record is devoid of such evidence, so Crawford attempts (at 21-22) to pass off the following "stray remarks" as such:

- a comment by Chief Burns, that he wanted to "stack bodies," when referring to two former WTAMU Title IX employees working across the hall;
- a comment made by Chief Burns to another WTAMU officer concerning his aversion towards complaining employees; and
- testimony from two former WTAMU Title IX employees who claimed Chief Burns retaliated against everyone involved with Munsell's investigation.

And on appeal, Crawford (at 23) offers an entirely new argument on this point: that Chief Burns "initiated the administrative and criminal investigations against Crawford . . . immediately after" learning about "the audio recording" Crawford created.

But as the district court correctly concluded, "none of this allegedly direct evidence refers specifically to Crawford." ROA.1462. Each remark concerns different

persons and, often, different underlying facts. ROA.240 (explaining context in which each statement was made). Accordingly, "none can prove adverse employment action motivated by retaliation without the need for 'inference or presumption.'" ROA.1462 (citing *Fabela*, 329 F.3d at 415). Crawford thus offers nothing more than circumstantial evidence.

But even if Chief Burns's "stray remarks" could somehow constitute direct evidence, "the 'burden of proof shifts to [WTAMU] to establish by [a] preponderance of evidence that the same decision would have been made regardless of the forbidden factor.'" *Fabela*, 329 F.3d at 415 (citation omitted). As explained below, *see infra* II.B, WTAMU can easily make that showing: the investigation into Crawford and the suspension that resulted therefrom had nothing to do with Crawford's participation in protected activity; it had everything to do with him recording his superior's private conversation in a campus police department without consent, and then lying about how he obtained that recording. Considering that dishonest and improper conduct, WTAMU was justified in suspending Crawford, and following the neutral panel's recommendation, Chief Burns was justified in issuing a dishonorable discharge against Crawford's peace-officer license.

## II. Crawford Lacks Circumstantial Evidence of Retaliation and Thus Cannot Satisfy the *McDonnell Douglas* Framework.

"Where, as here, the plaintiff does not produce any direct evidence of discrimination, [this Court] appl[ies] the well-known *McDonnell Douglas* burden-shifting framework." *Burrell*, 482 F.3d at 411. "Under the modified *McDonnell Douglas* approach, the plaintiff must first demonstrate a prima facie case of discrimination; the

defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that . . . the employer's reason is a pretext." *Id.* at 411-12. Crawford cannot clear a single *McDonnell Douglas* hurdle.

### A. Crawford cannot establish a prima facie retaliation case.

"To establish a prima facie case of retaliation, the plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (per curiam). Crawford fails at elements two and three, so he cannot establish a prima facie retaliation case.

#### 1. Crawford cannot establish an adverse employment action.

"For an employer's act to qualify as a[n] adverse action, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse.'" *Cabral v. Brennan*, 853 F.3d 763, 767 (5th Cir. 2017) (citation omitted). "The test [i]s meant to capture those employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 348 (2024) (citation omitted). To plead an adverse employment action, Crawford must "allege facts plausibly showing discrimination in hiring, firing, compensation, or in the 'terms, conditions, or privileges' of his or her employment." *Hamilton v. Dallas County*, 79 F.4th 494, 502–03 (5th Cir. 2023) (en banc) (quoting 42 U.S.C. § 2000e-2(a)(1)).

Crawford cannot make that showing. He alleges that three specific acts taken by WTAMU constitute "materially adverse" employment actions: (a) his suspension with pay; (b) the investigation into Crawford after he surreptitiously recorded the private conversation and lied about doing so; and (c) the dishonorable discharge against Crawford's peace-officer license resulting from his misconduct.[2] The district court held that the two former acts were not "materially adverse" employment actions. ROA.1464-65. And it did not consider the latter because that act was not presented in Crawford's live complaint or "his EEOC charge." ROA.1465-66. Each holding was correct.

*First*, under this Circuit's precedent, "suspension with pay" does not constitute an adverse employment action. *Breaux v. City of Garland*, 205 F.3d 150, 164 (5th Cir. 2000). Other circuits have held the same. *See, e.g.*, *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("A suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."). Applying those cases, the district court correctly concluded that Crawford's suspension with pay did not constitute a materially adverse employment action. Crawford offers no reason to depart from that precedent, nor has he argued that those cases were incorrectly decided.

---

[2] In the district court, Crawford abandoned (and the district court deemed forfeited) several other claims that were included in his EEOC complaint—that (1) in July 2022, then-Lieutenant Kyle Hawbaker said Crawford had no shot at making sergeant, and that (2) in August 2022, WTAMU initiated a disciplinary proceeding against Crawford after he failed to report sexual harassment during the August 2021 Title IX investigation. ROA.1460-61. Crawford has not challenged that holding in his brief, *see* Crawford Br. 19-21, and so those claims are now forfeited.

*Second*, likewise under this Circuit's precedent, initiating an internal investigation does not constitute a materially adverse employment action. *See Breaux*, 205 F.3d at 157 (noting that "investigations" "are *not* adverse employment actions" in the free-speech retaliation context); *see also Magiera v. City of Dallas*, 389 F. App'x 433, 437-38 (5th Cir. 2010) (per curiam) (concluding that an employer "investigat[ing] complaints lodged against" an employee was "not materially adverse actions"); *Pierce v. Tex. Dep't of Crim. Just., Institutional Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994) (same). The district court faithfully applied that precedent when it concluded that WTAMU's investigation into Crawford was not materially adverse. Crawford offers no reason for this Court to depart from this binding precedent or why his case is distinguishable.

*Third*, the district court correctly concluded that the dishonorable discharge was not "within the scope of Crawford's charge and complaint." ROA.1465. But Crawford argues (at 21) that "it is." Crawford is wrong. Nowhere in Crawford's EEOC complaint (or in his live complaint, for that matter) was the dishonorable discharge referenced as an adverse employment action. Instead, Crawford, in his EEOC charge, complained only about being "suspended with pay and [being] told that administrative and criminal charges were being initiated against [him]." ROA.938. The dishonorable discharge is not within "the scope of the EEOC investigation" and cannot "reasonably be expected to grow out of th[at] initial charge[] of discrimination." *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993). Having "not raised [the claim] in the [live] complaint" or his EEOC charge, Crawford's dishonorable discharge claim "is not properly before the court" because it has not been

administratively exhausted. *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).

Confronted by this binding precedent against his position, Crawford (at 32) seems to argue that this Court's en banc decision in *Hamilton* cuts in his favor. *See* 79 F.4th 494. Not so. *Hamilton* simply discarded this Circuit's prior practice of "limit[ing] the universe of actionable adverse employment actions [under Title VII] to so-called 'ultimate employment decisions.'" *Id.* at 497. Put differently, *Hamilton* broadened the category for what could constitute an adverse-employment action, but it did not overrule this Circuit's precedent (cited above) on what definitively does *not* constitute an adverse employment action, such as being suspended with pay or investigated for misconduct. *See Breaux*, 205 F.3d at 157, 164; *see also Muldrow*, 601 U.S. at 348. Crawford, for good reason, has not pressed this point beyond offering an unadorned legal assertion.

**2. Crawford cannot establish causation.**

Crawford also cannot prove causation. "[A]s a matter of prudence," the district court offered a dispositive holding on that element of Crawford's retaliation claim. ROA.1466. The district court's holding was correct: Crawford has not established "a causal connection . . . between the protected activity and the adverse employment action." ROA.1466 (citation omitted).

The alleged protected activity here was Crawford's participation in the August 2021 investigation. To establish causation, Crawford must "show that 'but for' th[at] protected activity, the adverse employment action"—here, Crawford's suspension with pay, the investigation into his spying, and his resulting dishonorable

discharge—"would not have occurred." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 349 (5th Cir. 2019) (citation omitted). Crawford cannot make that showing.

***Suspension***. The evidence shows that Crawford's suspension had nothing to do with his participation in the August 2021 investigation. Instead, Crawford was suspended after spying on (and recording) a private conversation between his Police Chief and Assistant Police Chief inside the police station. When an investigation is launched against a Texas A&M System employee like Crawford, a university regulation allows "paid leave," "in accordance with state law," "to [that] employee who is the subject of an investigation." Regulation 31.03.03, *Leaves of Absence with Pay* (rev. July 10, 2023), https://policies.tamus.edu/31-03-03.pdf. In his email informing Crawford about the investigation initiated against him, Chief Burns explicitly invoked "System Policy 31.03.03" as the basis for suspending Crawford with pay. ROA.276. Chief Burns merely followed standard university policy when placing Crawford on paid leave, and Crawford has no evidence otherwise. In analyzing causation, that fact is fatal.

***Investigation***. The investigation launched into Crawford's conduct likewise had nothing to do with Crawford's participation in the August 2021 investigation. "A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (citation omitted). True, Chief Burns knew that Crawford was a witness in the August 2021 investigation. But that does not establish causation because each allegedly adverse

employment act traces back to Crawford's voluntary choice to surreptitiously record a private phone call between his superiors and then lie about it. *See supra* I.A.1.

More importantly, Chief Burns' knowledge is irrelevant here: the Council-appointed panel, not Chief Burns, reviewed the investigation into Crawford. ROA.242. Indeed, Chief Burns voluntarily recused himself from the investigation to ensure that he would have no influence on it whatsoever. ROA.278. Thus, the relevant question is whether the Council-appointed panel—not Chief Burns—knew about Crawford's protected activity. The record confirms that the answer is no. *See* ROA.244, 246 (the panel swore that "[p]rior to making the[ir] recommendations, [they] had no knowledge that Crawford had participat[ed] in a Title IX investigation"); *cf. Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1123 (5th Cir. 1998) (finding causation where ultimate decisionmaker "merely rubber stamped" recommendation made by person who did not conduct "independent investigation" before making recommendation).

Crawford mistakenly insists otherwise, arguing (at 33) that even though the investigation was reviewed by an independent panel, "additional context indicates [Chief] Burns in fact influenced the outcome." According to Crawford, Chief Burns indirectly influenced the investigation through Assistant Chief Hawbaker's memo to the Council-appointed panel. Crawford Br. 33. But that is just a "speculative inference[] . . . which is insufficient to demonstrate the existence of a genuine issue of material fact." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 258 (5th Cir. 2009). The only direct evidence on that point—Chief Vaugn's and Chief Welch's affidavits—cuts against Crawford's argument. *See* ROA.244, 246.

Crawford also claims (at 25-26) that "the initiation and prosecution of the criminal complaint and the internal administrative proceedings were retaliatory" given their temporal proximity to Crawford's protected activity.[3] A causal link can "be established simply by showing close enough timing between the" protected activity and the adverse action. *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019). In this Circuit, a span greater than a few months is too distant to establish temporal proximity. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (approving cases holding that 3- and 4-month gaps are too long); *Goudeau v. Nat'l Oilwell Varco, LP*, 793 F.3d 470, 479 (5th Cir. 2015) (holding that 8- to 10-month gap is too long); *cf. January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023). The timeline here shows that the span between the August 2021 investigation and any of the alleged adverse employment acts is measured in *years*. Crawford thus fails to show causation.

***Dishonorable Discharge***. Even if Crawford properly pled dishonorable discharge in his EEOC charge or live complaint, *cf. supra* I.A.1, it too was unrelated to Crawford's participation in protected activity. The neutral, Council-appointed panel recommended that "Crawford face termination from WTAMU and a dishonorable discharge in his F-5 form to the Texas Commission on Law Enforcement" without having any knowledge of Crawford's protected activity. ROA.246. And as Chiefs Vaughn and Welch later attested, Chief Burns "was not involved in this process."

[3] To the extent Crawford alleges a temporal proximity between the protected activity and his suspension, the same argument applies: more than one year separates the protected activity and the adverse act.

ROA.242. When Chief Burns issued a dishonorable discharge against Crawford's peace-officer license, he was simply following the Council-appointed panel's unbiased recommendation. In other words, Chief Burns issued a dishonorable discharge because the Council-appointed panel recommended as much, *not* because Crawford participated in the August 2021 investigation.

Yet, Crawford continues to claim (at 33, 34) that, after "WTAMU did not receive permission or approval from TAMU System to terminate Crawford based on this sham internal investigation," Chief "Burns took it upon himself to ensure that Crawford was punished for his participation in protected activity." But the record shows otherwise. As discussed, Chief Burns issued a dishonorable discharge only *after* the neutral, Council-appointed panel recommended that action. For Crawford's argument to carry weight, Chief Burns must have acted *before* the Council-appointed panel issued its recommendation. Crawford's attempt (at 34) to manufacture a genuine issue of material fact here also fails because his argument "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991).

* * *

In all, Crawford cannot establish a prima facie case and this Court should affirm.

### B. WTAMU has a legitimate, non-retaliatory reason for each allegedly adverse employment action.

Even if Crawford established a prima facie case, WTAMU can meet its burden at the next *McDonnell Douglas* step: whether WTAMU had a legitimate, non-retaliatory reason for its allegedly adverse employment actions. At this step, WTAMU's

"burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy*, 492 F.3d at 557.

Crawford's improper conduct speaks for itself. In August 2021, Crawford participated in a Title IX investigation involving Munsell. In his interview with WTAMU's Title IX office, Crawford said that Munsell "told him a couple of months ago that she was experiencing 'sexual harassment,'" among other things. ROA.240. Failing to report "sexual harassment" constitutes a violation of various university regulations and state law, *see* Tex. Educ. Code § 51.252, and Chief Burns, pursuant to his duty as Police Chief, reported his "good faith belief that Crawford had not only violated" university policy "but that Crawford had also violated state law" after "failing to report sex-based discrimination." ROA.240. An investigation into that matter was thus initiated against Crawford.

With the investigation ongoing, Chief Burns and Assistant Chief Byrd engaged in a private phone call, where several confidential topics were discussed. Crawford secretly recorded this phone call inside department headquarters without anyone's consent—that constitutes a violation of several university policies. *See* ROA.286-87. It also constitutes a "blatant disregard of Texas (and likely Federal) law," as "Texas is a One-Party State in relation to recording a phone conversation." ROA.277.

But more importantly, Crawford then emailed the recording to SECO, proclaiming "This is from my desk in my office. It's that loud." ROA.288. Surveillance footage proves otherwise. "The area where Crawford held the phone and placed [it] was not his office, but rather a reception area." ROA.246. Video surveillance caught Crawford lying in 4k, and Crawford kept insisting otherwise because "he probably

[did] not know of the existence of the video recording[,] which fully discredits his story." ROA.290. A picture here is worth a thousand words:




ROA.282.

Only after reviewing this evidence did the Council-appointed panel find that "Crawford was dishonest." ROA.291. The most likely reason for why "Crawford did not admit to recording from the suite/hallway door" is that Crawford "knew this was unethical (and possibly illegal) behavior." ROA.286. Lying in an "official" "written communication," like Crawford's email, constitutes a violation of several university policies. ROA.286-87. The panel concluded as much and recommended that "Crawford face termination from WTAMU and a dishonorable discharge."

ROA.246. Accordingly, this recommendation was based on Crawford's inappropriate conduct—recording a private conversation and then lying about it. *Supra* I.A.2.

Crawford nevertheless insists (at 17) that a "core," "disputed fact issue . . . remains" on whether "Crawford began the recording from his desk," which, according to Crawford, if true shows that Crawford did not lie. That is wrong because the surveillance footage clearly shows otherwise. At the video's "10:38:20" mark, Crawford is seen "walk[ing] over to the suite/hallway door," near Assistant Chief Byrd's office, with "[h]is phone . . . in his hand" and "appear[ing] to be audio recording." ROA.281. At the "10:40:05" mark, "Crawford retrieves his phone" from where he "set[]" it down and "then walks back in his office." ROA.281. The audio recording Crawford submitted is "approximately one minute and 44 seconds"—nearly the exact span between when Crawford started recording and when Crawford retrieved his phone. ROA.281. The considerable distance between Assistant Chief Byrd's office and Crawford's desk—about 27 feet—and the intervening doors and walls that would absorb the sound make Crawford's argument here even more improbable. *See* ROA.281 (finding Crawford's argument "highly doubtful" given the great distance).

In sum, WTAMU had a legitimate, non-retaliatory reason for every adverse employment action Crawford alleges. The burden, therefore, shifts back to Crawford.

### C. Crawford cannot establish pretext.

Even if the Court reaches step three, Crawford cannot establish that WTAMU's legitimate, non-retaliatory reason was pretextual. Once "the employer carries its burden," as WTAMU did here, "the mandatory inference of discrimination created

by the plaintiff's prima facie case drops out of the picture and the fact finder must decide the ultimate question: whether the plaintiff has proven intentional discrimination." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000) (citation modified). "To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *McCoy*, 492 F.3d at 557. Crawford cannot do so. WTAMU's articulated, non-retaliatory reason here—that Crawford violated university policy and state law by lurking near his superior's office door, recording a private conversation, and then lying about it—is unwavering.

Much of Crawford's argument on pretext (at 26-32) is copied from his internal complaint against Chief Burns, which was thoroughly rejected as meritless. *See* ROA.292-98. Crawford, for example, claims (at 26, 29) that Chief Burns offered a "shifting story about why []his conversation was purportedly confidential" because "[t]here was no reasonable expectation that this conversation was private." But Crawford's own behavior contradicts this argument. If Chief Burns' and Assistant Chief Byrd's conversation was not private, and if what Crawford was doing did not violate university policy or state law, then why did Crawford hide near Assistant Chief Byrd's door and secretly procure the recording? Crawford has no answer to that fatal question because his behavior—caught on camera—speaks for itself.

Crawford also claims (at 26-27, 28) that WTAMU's legitimate explanation here was "false" because "Crawford has direct evidence that Burns had a retaliatory intent." But as discussed, *see supra* I, what Crawford considers direct evidence is nothing more than circumstantial evidence. And none of that circumstantial evidence—namely, Chief Burns's "stray remarks"—can show pretext here. None of those

remarks remotely concern Crawford or his participation in protected activity. And all of those remarks were harmless. For example, when "out of frustration" Chief Burns stated an intention to "start stacking bodies," nothing ever resulted from it, as the referenced employees "didn't answer to" him. ROA.240. Indeed, "of the many witnesses in the Title IX investigation," including Crawford, "only one witness was terminated," and that was "for unrelated reasons." ROA.240. Without more, those "stray remarks" offer no aid to Crawford's claim.

Crawford also argues (at 26, 27) that Chief Burns treated him "differently from other employees" based on the suspicion that Chief Burns "did not initiate similar complaints against other officers." But Crawford cites no evidence that Chief Burns treated other employees differently or retaliated against anyone that participated in the August 2021 investigation. "Even three years after the" investigation, "only one witness was terminated" "for unrelated reasons," and "[o]ther witnesses . . . left on their own accord." ROA.240. To the extent Crawford was treated differently, it is because Crawford was the only employee bold and low enough to secretly record his superiors' private conversation inside department headquarters and then lie about it. Nothing Crawford points to shows that WTAMU's legitimate, non-retaliatory reason was pretextual.[4]

---

[4] Crawford argues elsewhere (at 19) that the district court "erroneously cabined" its analysis when it "disregard[ed]" "relevant background evidence," namely the other untimely claims that were included in his EEOC complaint, *see supra* note 2. But the district court did not "disregard" any relevant background evidence; it simply did not "consider[]" that background evidence as constituting justiciable claims because they were untimely. ROA.1461. Regardless, that "evidence" is irrelevant because

But even if Crawford could show WTAMU's reason was pretextual, "a showing of pretext does not automatically entitle an employee to a judgment as a matter of law." *Russell*, 235 F.3d at 223. After all, "[i]t is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* (citation modified). Crawford's argument here largely corresponds with what Crawford used previously to support his underwhelming prima facie case. *Supra* I.A. Crawford cannot prove that WTAMU retaliated against him for the same reasons he cannot show retaliation to support his prima facie case.

* * *

Crawford cannot carry his burden under *McDonnell Douglas* to show that WTAMU's legitimate, non-retaliatory reason for suspending and investigating him was pretextual. This Court should thus affirm.

---

the record overwhelmingly supports the reality that WTAMU's allegedly adverse employment acts stemmed from Crawford's spying and lying, *not* Crawford's participation in protected activity.

## Conclusion and Prayer

For these reasons, this Court should affirm the district court's judgment granting summary judgment in WTAMU's favor.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General

Nathaniel A. Plemons
Assistant Solicitor General

/s/ Mohmed I. Patel
Mohmed I. Patel
Assistant Attorney General
Mohmed.Patel@oag.texas.gov

*Counsel for Appellee*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,247 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ Mohmed I. Patel
Mohmed I. Patel