# No. 25-10887

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

Nathan Crawford,

Plaintiff - Appellant

v.

West Texas A&M University,

Defendant - Appellee

---

**On Appeal from**

United States District Court for the Northern District of Texas

2:23-CV-152

---

## REPLY BRIEF OF APPELLANT NATHAN CRAWFORD

---

SUBMITTED BY:

Kyle Thomas Carney
Carney Law, P.L.L.C.
9800 Hillwood Parkway
Fort Worth, TX 76177

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i
TABLE OF AUTHORITIES .......... 1
ARGUMENT .......... 3
I. WTAMU's Brief Confirms the District Court's Core Error: Weighing Evidence and Making Credibility Determinations at Summary Judgment... .......... 5
A. The Summary Judgment Standard Requires Viewing Evidence in Crawford's Favor. .......... 6
II. The Record Contains Direct Evidence of Retaliatory Motive. .......... 10
A. Audio Recordings Provide Direct Evidence of Burns' Retaliatory Motive with Statements Both about Employees Participating in Title IX Generally and about Crawford Specifically. .......... 10
III. WTAMU's "Legitimate Reason" Depends Entirely on Resolving Disputed Facts in WTAMU's Favor. .......... 12
A. Whether Crawford Engaged in "Misconduct" Is Itself a Disputed Fact. .......... 12
B. WTAMU Cannot Meet Its *McDonnell Douglas* Burden by Pointing to Disputed Facts. .......... 13
C. WTAMU's Selective Enforcement Demonstrates Pretext. .......... 15
D. The Undisputed Timeline Demonstrates Retaliation. .......... 16
E. The "Independent Panel" Was Neither Independent Nor Determinative. .......... 18
IV. The Dishonorable Discharge Was Properly Exhausted, and the Other Adverse Actions Were Materially Adverse Under *Hamilton*. .......... 22
A. The Dishonorable Discharge Was Within the Scope of Crawford's EEOC Charge. .......... 22
B. The Adverse Actions Were Materially Adverse Under *Hamilton*. .......... 23
CONCLUSION .......... 25
CERTIFICATE OF SERVICE .......... 26
CERTIFICATE OF COMPLIANCE .......... 27

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................... 6

*Breaux v. City of Garland*,
205 F.3d 157 .................... 24

*Burlington N. & Santa Fe Ry. v. White*,
548 U.S. 53; 126 S. Ct. 2405 (2006) .................... 3

*Caboni v. Gen. Motors Corp.*,
278 F.3d 448 (5th Cir. 2002) .................... 6

*Fabela v. Socorro Indep. Sch. Dist.*,
329 F.3d 409 (5th Cir. 2003) .................... 11

*Fahim v. Marriott Hotel Servs., Inc.*,
551 F.3d 344 (5th Cir. 2008) .................... 6

*Fine v. GAF Chem. Corp.*,
995 F.2d 576 (5th Cir. 1993) .................... 22

*Hamilton v. Dallas County*,
79 F.4th 494 (5th Cir. 2023) .................... 23

*January v. City of Huntsville*,
74 F.4th 646 .................... 18

*Lee v. Kansas City S. Ry. Co.*,
574 F.3d 253 (5th Cir. 2009) .................... 19

*McCoy v. City of Shreveport*,
492 F.3d 551 (5th Cir. 2007) .................... 14

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) .................... 23

*Ramirez v. Granado*,
163 F.4th 204 (5th Cir. 2025) ....................7

*Sherrod v. Am. Airlines, Inc.*,
132 F.3d 1112 (5th Cir. 1998) ....................19

**FEDERAL RULES**

Fed. R. App. P. 5 .................... 27

Fed. R. App. P. 32(a)(5).................... 27

Fed. R. App. P. 32(a)(6).................... 27

Fed. R. App. P. 32(a)(7)(B).................... 27

Fed. R. App. P. 32(f) .................... 27

Fed. R. Civ. P. 8 .................... 23

# ARGUMENT

This case requires reversal because the district court erred in supplanting the role of the jury to decide fact issues upon which reasonable minds can differ. WTAMU doubles down on this error, asking this Court to make a credibility determination about disputed evidence in violation of the binding summary judgment standards that control the analysis.

In a nutshell, Crawford recorded the WTAMU police chief discussing discipline of Crawford because of Crawford's participation in a Title IX investigation, and WTAMU initiated criminal investigations against Crawford in response. The key inquiry is whether WTAMU's actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409 (2006)).

The recorded statements by Chief Burns and his assistant brainstorming responses to Crawford's reports to Title IX constituted direct evidence of retaliation. *see also* ROA.1239 (WTAMU-C_001842 (Plf.'s Ex. 37 to the Response to Motion for Summary Judgment) (the audio recording of Chief Burns discussing with his assistant chief a response to Crawford's participation in a Title IX investigation). The record also includes direct evidence of Chief Burns' recorded statements made to others. Burns

admittedly said he would "stack bodies" of employees and that if he thought police officers complained he would "find a way" to fire them. ROA.436; ROA.750-52; ROA.1237. Two former Title IX directors (Ecker and Middleton) separated from employment with WTAMU after the Title IX investigations because of the retaliatory culture at WTAMU. The evidence shows Chief Burns' intent, pattern, and practice of punishing employees like Crawford for testifying against UPD leadership in the Title IX investigation, and WTAMU covering for him.

WTAMU asks the Court to look the other way by pointing to a video of Crawford recording the Chief of police in the hallway. Appellee's Br. at 7–8. WTAMU focuses on a single statement Crawford wrote about the recording in an email: "This is from my desk in my office." ROA.1430 (WTAMU-C_001854); ROA.343-44; ROA.1239. WTAMU argues that Crawford "lied" about the recording based on the statement that the recording was from his desk. But in its brief, WTAMU admits that Crawford was moving in and out of his office. Appellee's Br. at 7–8. Indeed, the video showed Crawford in his office before the recording, then moving toward the hallway. ROA.280-81. So a more reasonable inference—and the proper inference at the summary judgment stage—is that Crawford meant that part for the recording was from his desk, which was true about where the recording originated. WTAMU asks

the Court to draw an inference in its favor from Crawford moving into the foyer for another part of the recording, and that is not appropriate under the summary judgment standard.

It is the jury's role to decide the credibility questions at issue. The district court erred in entering a judicial finding on the questions of fact in dispute. As a result, the summary judgment order must be reversed and the case remanded for trial.

## I. WTAMU's Brief Confirms the District Court's Core Error: Weighing Evidence and Making Credibility Determinations at Summary Judgment.

This appeal comes down to a fundamental question: Did the district court apply the correct summary judgment standard? WTAMU's brief confirms it did not. Throughout their brief, WTAMU repeatedly asks this Court to accept its version of disputed facts, make credibility determinations against Crawford, and draw inferences in its favor, which is precisely the error with the judgment below.

The district court granted summary judgment only by concluding Crawford "lied" about the recording, that his conduct was "dishonest," and that his "deliberate choice to lie" caused the discipline. ROA.1467. But whether Crawford lied is a disputed fact that turns on credibility, which is a

determination courts cannot make on summary judgment. Because the district court made that erroneous determination, this Court should reverse.

### A. The Summary Judgment Standard Requires Viewing Evidence in Crawford's Favor.

The summary judgment standard is well-established. "In determining whether a genuine issue as to any material fact exists, courts must view the evidence in the light most favorable to the nonmoving party." *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348-49 (5th Cir. 2008). Moreover, courts "must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The district court violated these principles in two critical ways. First, the district court made credibility determinations. The court concluded Crawford "falsely represented" where he made the recording and engaged in a "deliberate choice to lie." ROA.1467. This determination required the court to disbelieve Crawford's explanation—that he began recording from his desk before moving closer to improve audio quality—and instead credit WTAMU's

interpretation that the email was a calculated falsehood. That is precisely the type of credibility determination courts cannot make at summary judgment.

Second, the district court drew inferences in WTAMU's favor. The surveillance video shows Crawford in his office area before the recording, then moving toward the foyer and hallway. ROA.280-81. The video does not definitively show where Crawford first pressed "record" on his phone. From this ambiguous evidence, two competing inferences are possible, either:

- **Crawford's inference:** He heard the retaliatory conversation from his desk, started recording there as he stated in his email, then moved closer to capture better audio of an open-door conversation occurring in a common area where he had every right to be; or

- **WTAMU's inference:** Crawford intentionally deceived investigators by claiming the recording was "from my desk" when he actually only recorded from the hallway, demonstrating dishonesty that justified termination.

The existence of two plausible inferences means summary judgment is improper. "At summary judgment, the question is not whether a judge can craft a tidy narrative from selected fragments of the record; it is whether a reasonable jury, crediting the nonmovant's evidence and drawing all reasonable inferences in her favor, could find for her." *Ramirez v. Granado*, 163 F.4th 204, 212 (5th Cir. 2025).

The central factual dispute is straightforward and highlighted by WTAMU's argument: Did Crawford lie when he wrote that the recording was

"from my desk in my office"? Crawford has evidence to support his truthfulness:

- Crawford stated the recording was "from my desk in my office." ROA.1430. This is literally accurate, as he started recording at his desk.

- No evidence contradicts that Crawford began recording at his desk. The video shows him in his office before the recording period. ROA.280-81.

- Crawford explained his position fully in writing, including by providing the reasons there was no expectation of privacy in the recorded conversation, and he never once stated that he was only recording from his desk. ROA.1004–06 (Appx. 22).

- Crawford had the legal right to be in all relevant locations—his office, the foyer area he regularly used for work, and the hallway. ROA.575-81 (Asst. Chief Hawbaker admitting in deposition that Crawford was not prohibited from being in those locations and that Crawford could record if there was no reasonable expectation of privacy).

- The conversation was loud enough to hear from Crawford's office, over an open speakerphone, through an open door. ROA.343-44, 1430.

- Crawford immediately reported the recording to TAMU System investigators, demonstrating he believed his actions were proper. ROA.1430. Additionally, the email to investigators was only three short sentences, which indicates it was sent in haste and not intended to provide a comprehensive report. *Id.*

In other words, Crawford acted promptly in reporting wrongdoing. (which WTAMU never corrected), and Crawford remained consistent and steadfast in spite of heavy-handed opposition against him.

Contrast that with WTAMU's evidence supporting an inference of dishonesty:

- The video shows the clearest footage of Crawford holding his phone occurred in the hallway after Crawford walked out of his office. ROA.280-82.

That's it. That is the entirety of WTAMU's evidence of purportedly "lying." WTAMU interprets "from my desk" to mean the entire recording occurred at Crawford's desk, making the statement false. The reality is that reasonable minds can differ on whether Crawford's email was accurate or false. Some jurors might conclude "from my desk" means the recording originated there, even if Crawford later moved. Other jurors might conclude the statement was misleadingly incomplete. But that determination belongs to a jury, not a judge at summary judgment.

WTAMU argues (Appellee Br. at 28) that "the surveillance footage clearly shows otherwise" and thus no genuine dispute exists. This argument fails for two reasons. First, the video does not show when Crawford pressed the record button. It shows him moving between locations during the timeframe of the conversation. Second, even if the video clearly showed Crawford only recorded from the hallway, that would not prove Crawford lied about his subjective understanding or intent in writing "from my desk."

Proof of lying requires proof of intent to deceive, which demands credibility assessments.

The district court adopted WTAMU's preferred inference and performed the jury's factfinding role, which was error. As a result, the summary judgment order must be reversed.

## II. The Record Contains Direct Evidence of Retaliatory Motive.

### A. Audio Recordings Provide Direct Evidence of Burns' Retaliatory Motive with Statements Both about Employees Participating in Title IX Generally and about Crawford Specifically.

WTAMU spends considerable effort trying to characterize Crawford's evidence of retaliatory motive as mere "stray remarks" that constitute only circumstantial evidence. Appellee Br. at 15-17. This characterization fails because Crawford presented direct evidence of Burns's retaliatory intent.

The recording itself is direct evidence. The audio recording Crawford made captured Burns and Byrd discussing discipline of Crawford related to his Title IX participation. ROA.1239. That is not a "stray remark" untethered from any adverse action—it is a recording of Crawford's superiors plotting the very retaliatory actions later taken against him. Additionally, Crawford provided recorded audio of discussions between himself and Jeremy Middleton, then-Title IX director, about how to evade retaliation at WTAMU. ROA.1240.

WTAMU argues that Crawford's evidence does not constitute direct evidence because it "refers to different persons and, often, different underlying facts." (Appellee Br. at 16-17). This argument ignores binding precedent. Direct evidence need not specifically name the plaintiff or refer to the exact adverse action. "In a Title VII context, direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but *a* basis—for the adverse employment action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (emphasis added).

Here, Burns's statements show that retaliation against Title IX participants served as a basis for adverse actions. The statements establish Burns's modus operandi. Burns told departmental employees that "careers and bodies will be left in the wake" if officers continued making complaints. ROA.1234. Burns told Lt. Ferrara he would "find a way to get rid of" anyone he suspected of complaining by working with HR and legal counsel. ROA.721, 1237. Burns threatened to "stack bodies" against Title IX employees across the hall. ROA.710. Burns followed through—terminating or forcing out the Title IX directors and most female complainants. ROA.445-47, 705.

These statements are not isolated remarks made in unrelated contexts. They establish Burns's pattern and practice of retaliating against anyone who participated in complaints against him or his favored officers. When Crawford became a witness in the Title IX investigation, he became a target of that same retaliatory campaign.

Crawford offered direct evidence of retaliatory conduct, and WTAMU failed its burden to conclusively show that its reason for adverse actions against Crawford were for legitimate reasons. As a result, these disputed issues must be submitted to the jury.

## III. WTAMU's "Legitimate Reason" Depends Entirely on Resolving Disputed Facts in WTAMU's Favor.

### A. Whether Crawford Engaged in "Misconduct" Is Itself a Disputed Fact.

WTAMU structures its entire defense around the premise that Crawford engaged in serious misconduct—secretly recording superiors and lying about it—that justified suspension, investigation, and ultimately a dishonorable discharge. Appellee Br. at 25-28. But this premise rests on disputed facts that cannot be resolved at summary judgment.

With respect to the recording of Chief Burns, WTAMU characterizes Crawford's conduct as clearly improper—a policy violation and potential crime. The record evidence shows otherwise. There was no violation of any

statutory or regulatory law. The Texas Rangers investigated and declined to pursue charges. ROA.1236. The conversation was not confidential, as Burns himself admitted it occurred over speakerphone with an open door in a common area. ROA.726 at deposition 133:14-15. The Texas Rangers investigated and declined to pursue charges. ROA.1236. There was no policy violation either. Burns admitted to the Texas Rangers there was no specific policy that directly applied to Crawford's recording. ROA.1236. Whether Crawford's conduct constituted "misconduct" is thus a disputed question of fact that is, at most, a jury question.

As demonstrated above, whether Crawford's email was dishonest depends entirely on credibility determinations and competing inferences. WTAMU argues Crawford's statement was "highly doubtful" given the distance between the offices. Appellee Br. at 28. But "highly doubtful" is not the summary judgment standard. The question is whether Crawford's explanation is plausible enough that a reasonable jury could credit it. It plainly is.

### B. WTAMU Cannot Meet Its *McDonnell Douglas* Burden by Pointing to Disputed Facts.

Under McDonnell Douglas, once Crawford establishes a prima facie case, WTAMU must articulate a "legitimate, non-retaliatory reason" for the

challenged employment actions. WTAMU argues it has met this burden by pointing to Crawford's misconduct. Appellee Br. at 25-28.

But WTAMU's "legitimate reason" only exists if one accepts WTAMU's version of disputed facts. If a jury credits Crawford's version—that he began the recording from his desk and acted properly in documenting retaliatory threats—then WTAMU has no legitimate reason at all. The supposed "misconduct" evaporates.

To put it another way: WTAMU's "legitimate reason" is that Crawford lied. But whether Crawford lied is the disputed fact at the center of this case. WTAMU cannot satisfy its *McDonnell Douglas* burden by pointing to a disputed fact and declaring it true.

This is particularly important because, at the summary judgment stage, "the defendant's burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). WTAMU satisfies its production burden by offering evidence that Crawford engaged in misconduct. But once that evidence is in the record, the burden shifts back to Crawford to show pretext. And Crawford can meet that burden by pointing to the genuine disputes about whether the alleged "misconduct" occurred at all.

### C. WTAMU's Selective Enforcement Demonstrates Pretext.

Even assuming Crawford's conduct was somehow improper, WTAMU's wildly disproportionate response demonstrates pretext. Burns immediately initiated both administrative and criminal investigations against Crawford, which follows his pattern and modus operandi in the manner in which he systematically removed all employees who testified against his leadership in the Title IX investigations.

Virtually all of the female officers who filed Title IX complaints against Sergeant Price were either terminated or constructively discharged. ROA.339-40, 705, 1436-37. Lt. Barbara Ferrara, who also participated as a witness in the Title IX investigation, was forced into an involuntary reassignment against her will as retaliation for her testimony. ROA.1437. These women who complained of actual sexual harassment and discrimination were driven out of UPD. WTAMU's Title IX coordinators were also terminated. ROA.445-47. And Jeremy Middleton, one of the former Title IX investigators, openly discussed the ongoing retaliation with Crawford and encouraged Crawford to leave employment with WTAMU to escape the retaliation. ROA.1240 (Audio recording, particularly from 20:00-40:00).

Comparatively, WTAMU protected those who engaged in misconduct or who were loyal to Chief Burns during the Title IX proceedings. Chief Burns protected the male officers who were accused of sexual harassment by female officers so that they were not immediately terminated and given opportunities to resign without discharge. Burns himself was never given any discipline beyond a verbal reprimand from WTAMU leadership following the "stacking bodies" comments.

But Crawford's alleged inaccuracy about where he stood when making a recording, according to WTAMU, justified suspension, multiple investigations, threats of criminal prosecution, and a dishonorable discharge. This selective enforcement is itself evidence of pretext. A reasonable jury could conclude WTAMU seized on the email as a pretextual justification to accomplish what Burns had already decided—getting rid of Crawford for his Title IX testimony.

### D. The Undisputed Timeline Demonstrates Retaliation.

WTAMU argues (Appellee Br. at 21-24) that Crawford cannot show causation because too much time elapsed between the August 2021 Title IX investigation and the February 2023 suspension. This argument ignores the actual sequence of events:

- August 2021: Crawford provides testimony supporting female officers' Title IX complaints against Price. ROA.340, 364.

- August 2022: After reviewing the Title IX report identifying Crawford as a supporting witness, Burns files a Title IX complaint against Crawford for allegedly failing to report promptly. ROA.339-40.
- **October 2022:** Crawford records Burns and Byrd discussing further discipline of Crawford related to Title IX participation. ROA.343-44, 1239.
    - Note, this timeframe already includes a short time frame between Crawford reporting Burns, and Burns planning to discipline Crawford—Burns simply did not yet have a defined plan when he was recorded discussing Crawford's Title IX activity.
- December 2022: Burns has Byrd file a formal complaint against Crawford for the recording. ROA.277.
- February 2023: Crawford is suspended and investigations are initiated. ROA.276.
- February-May 2023: WTAMU continues its "investigation" without acting on it, WTAMU leadership (Burns, Hawbaker, and Rikel) discuss the investigation of Crawford, and WTAMU prevents Crawford returning to duty, despite previously allowing Aaron Price to return to duty before his administrative case was completed. ROA.1417-18.
- May 2023: Burns issues dishonorable discharge. ROA.728.

The timeline shows multiple short intervals between Crawford's protected activity and Burns' retaliatory conduct. This is not a case where Crawford engaged in protected activity and then, years later, was disciplined once for unrelated reasons. This is a continuous campaign of retaliation that began the moment Burns learned Crawford supported the female complainants and continued until Crawford was forced out.

The key triggering event for the final round of retaliation was Crawford obtaining proof of Burns's retaliatory discussions—the recording. Burns reacted immediately by initiating multiple investigations. The temporal proximity between Crawford reporting the retaliatory conversation (October 11, 2022) and Burns initiating the investigations (December 7, 2022) is less than two months. That easily satisfies the causation requirement. *January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) (a short timeframe of "a few months" supports causation).

### E. The "Independent Panel" Was Neither Independent Nor Determinative.

WTAMU argues (Appellee Br. at 23-24) that Burns's retaliatory motive is irrelevant because an "independent panel" made the termination recommendation without knowledge of Crawford's protected activity. This argument fails on multiple levels.

First, the panel was not independent. Burns controlled and influenced the process. Burns personally initiated both the administrative and criminal investigations. ROA.276. Burns hand-picked Hawbaker—his direct subordinate—to investigate and compile the report for the purportedly "external" review. ROA.276, 704. Hawbaker reported directly to Burns and owed his position to Burns. Burns personally appointed the external chiefs and discussed the case with them prior to their review. ROA.704–05. The

external chiefs relied on Hawbaker's investigation and recommendations. ROA.704. Burns received the panel's recommendation and then personally made the final decision to issue a dishonorable discharge. ROA.728.

To call this process "independent" strains credulity. Burns selected his own subordinate to investigate, that subordinate compiled a report recommending termination, and Burns implemented the recommendation. The external chiefs simply rubber-stamped Hawbaker's findings without conducting any independent investigation or even interviewing Crawford. ROA.597-98.

Second, the panel's alleged lack of knowledge is not dispositive. WTAMU cites *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009), for the proposition that the decisionmaker's knowledge matters. But Crawford does not dispute that principle. The problem is identifying who the real decisionmaker was.

The external chiefs were not independent decisionmakers exercising their own judgment. They were either Burns's instruments or at least influenced by Burns to the point of being compromised, implementing Burns' predetermined decision through a process he initiated, controlled, and reviewed. This is the type of scenario this Court addressed in *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1123 (5th Cir. 1998), where the Court found

causation even though the nominal decisionmaker lacked knowledge of protected activity, because that decisionmaker "merely rubber stamped" a recommendation made by someone who did have the requisite retaliatory motive. And again, the external chiefs based their review on Assistant Chief Hawbaker's memorandum and recommendation. And as shown in his deposition, Assistant Chief Hawbaker's own recommendations did not hold up in questioning on the premises upon which they were based: i.e., Assistant Chief Hawbaker conceded in deposition that Crawford had a right to be in the areas where he was recording, and Hawbaker was unable to articulate a basis for any reasonable expectation of privacy. ROA.575-81; ROA. 587-89 (admitting officers would not have discussions about confidential matters without the doors closed); ROA.590-91 (admitting that he concluded Crawford could probably hear the conversation from his desk).

Moreover, Burns himself was a decisionmaker. Burns himself is the person who appointed the external chiefs. ROA.704-05. The final decision went back to him. ROA.727 (Burns admitting he reviewed the external chiefs' recommendations). Burns decided to suspend Crawford. Burns decided to initiate investigations. And Burns decided to issue the dishonorable discharge. The fact that Burns enlisted others to provide cover for these decisions does not insulate him from liability.

Third, Burns's influence is demonstrated by the pretextual nature of the investigation. The investigation focused entirely on whether Crawford lied about "from my desk" while ignoring the content of what Crawford recorded—Burns plotting retaliation. A truly independent investigation would have examined both Crawford's conduct and Burns's conduct captured in the recording. The record shows that WTAMU never disciplined Burns for his retaliatory conduct against Crawford. ROA.585, 591-92. The investigation's one-sided focus on Crawford demonstrates Burns's influence throughout the process.

Because Burns kept his hand on the process throughout, he was never functionally recused at all. Instead, he influenced a process that was rubber stamped and that he had the authority to review and act upon. Merely placing a phone call (ROA.704-05) to ask friendly reviewers to look at his assistant chief's report is hardly an "independent" investigation, if one can call it that at all. The record shows that Burns was the functional decisionmaker, and the summary judgment should be reversed.

## IV. The Dishonorable Discharge Was Properly Exhausted, and the Other Adverse Actions Were Materially Adverse Under *Hamilton*.

### A. The Dishonorable Discharge Was Within the Scope of Crawford's EEOC Charge.

WTAMU argues (Appellee Br. at 20-21) that Crawford's dishonorable discharge claim was not exhausted because it was not specifically mentioned in his EEOC charge and separately listed in his complaint. This argument reflects a misunderstanding of exhaustion requirements and pleading standards under Rule 8.

WTAMU appears to accept that the binding law allows for claims under Title VII that are within the scope of the EEOC investigation that "could reasonably be expected to grow out of the initial charges of discrimination." *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993). WTAMU merely disputes that the dishonorable discharge fits within that scope. But WTAMU admits that Crawford complained that he was "suspended with pay and [being] told that administrative and criminal charges were being initiated against [him]." (Appellee's Br. at 20 (citing ROA.938)). The dishonorable discharge is such an administrative charge and flows logically from the complaint about criminal charges and the retaliatory investigation. WTAMU's argument that this would be outside the scope of the EEOC investigation is untenable.

Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. There is no heightened specificity pleading requirement for Title VII claims. In his complaint, Crawford pleaded that "WTAMU threatened Mr. Crawford with administrative and criminal charges." ROA.11 at ¶ 12. WTAMU was on notice that Crawford was complaining about its actions retaliating against Crawford with administrative and criminal complaints based on his participation in Title IX investigations.

### B. The Adverse Actions Were Materially Adverse Under *Hamilton*.

WTAMU argues (Appellee Br. at 18-21) that suspension with pay and investigations are not materially adverse actions. These arguments fail under this Court's en banc decision in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc).

*Hamilton* rejected the prior practice of limiting actionable Title VII claims to "ultimate employment decisions." *Id.* at 497. Instead, Title VII reaches any employer action affecting the "terms, conditions, or privileges of employment." *Id.* The test is whether the action was harmful enough to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Muldrow v. City of St. Louis*, 601 U.S. 346, 348, 357 (2024).

Even suspension with pay satisfies this standard in the retaliation context. Crawford was removed from his duties, stripped of his credentials and weapons, and told he faced potential criminal prosecution. ROA.276. This sent a clear message that supporting Title IX complainants would result in investigation and potential termination. A reasonable officer would be dissuaded from future complaints by such treatment.

Moreover, the cases WTAMU cites pre-date *Hamilton* and apply the now-rejected "ultimate employment decisions" framework. For example, WTAMU cites *Breaux v. City of Garland*, 205 F.3d 150, 157, 164 (5th Cir. 2000) for the proposition that investigations cannot constitute an adverse employment action. Appellee's Br. at 21. But the *Breaux* opinion specifically premised its holding based on the "narrow view of what constitutes an adverse employment action." *Breaux v. City of Garland*, 205 F.3d at 157. As a result, that holding is no longer good law after *Hamilton*.

As a backup, WTAMU argues that there is no causal link between Crawford's investigation and his participation in Title IX proceedings. But that argument is at least doubtful and at most a jury question, particularly given the recordings of Chief Burns stating that he would fire employees and specifically discussing Crawford's Title IX complaint against him.

In any event, the initiation of both administrative and criminal investigations against Crawford—including referral to the Texas Rangers—goes far beyond routine workplace oversight. Burns threatened Crawford with imprisonment based on the recording incident. A criminal investigation of a police officer is materially adverse because it threatens both employment and liberty. A reasonable officer, or any university employee, would certainly be dissuaded from supporting discrimination complaints if doing so could lead to criminal prosecution for good faith submission of evidence to report a complaint.

With issues of material fact in dispute, the district court erred in resolving competing inferences against the nonmovant and in granting summary judgment. As a result, the judgment must be reversed and the case remanded for trial

## CONCLUSION

Appellant Nathan Crawford asks the Court to reverse and remand, and for all further relief.

SUBMITTED BY:
S/Kyle Thomas Carney
Carney Law, P.L.L.C.
9800 Hillwood Parkway
Fort Worth, TX 76177

## CERTIFICATE OF SERVICE

I certify that on March 9, 2026, an electronic copy of this brief was served on each party in this case in accordance with the Federal Rules of Appellate Procedure. The name and address of the party or lead counsel served, and the manner of service, are indicated below:

Mohmed Idris Patel (mohmed.patel@oag.texas.gov), Assistant Attorneys General, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, TX 78711-2548.

S/Kyle Thomas Carney

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 5th CIR. R32.1: this document contains 4,530 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft ® Office Mac Word in 14-point, Georgia type style.

S/Kyle Thomas Carney